NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TOSIN ADEGBUJI, | : | |
| | : | Civil Action No. 03-cv-1757 (PGS) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | OPINION |
| MIDDLESEX COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**SHERIDAN, U.S.D.J.**

This matter comes before this Court on several motions for summary judgment filed on behalf of all defendants, with the exception of Contract Pharmacy Services, who has not answered on account of not being properly served. Plaintiff, a pro se Bureau of Immigration and Customs Enforcement ("BICE") detainee, formerly held in the Middlesex County Adult Correctional Center (MCACC), filed a Complaint based on various federal and state law claims including excessive force, inadequate medical care, conspiracy, medical malpractice, negligence, intentional infliction of emotional distress, and violation of the New Jersey Law Against Discrimination (NJLAD), among other claims. The Complaint contains allegations against several corrections officers, medical providers, the warden, the deputy warden, and various Middlesex County entities. Plaintiff has since been released from the MCACC and was thereafter deported. Plaintiff is currently residing in the United Kingdom.

I.

Plaintiff, Tosin Adegbuji, a native of Nigeria, originally came to the United States in 1986 under a student visa. In 1989, plaintiff was arrested for issuing bad checks and sentenced to two years probation. Plaintiff was again arrested in 1990 for credit card fraud, to which he pled guilty, and received a three year probation term. Following deportation in 1991, plaintiff returned to the United States illegally in 1993, under a false name. Plaintiff was soon thereafter arrested on charges of credit card fraud and given an enhanced sentence of one year at a federal correctional facility. After serving his sentence, plaintiff was released on probationary status. However, in violation of his supervised release, plaintiff returned to Nigeria in 1994 where he remained for approximately seven years. In 2001, plaintiff relocated from Nigeria to the United Kingdom. The following year, in 2002, plaintiff returned to the United States where he was arrested and taken into custody at customs pursuant to an outstanding arrest warrant stemming from his violation of probation. There is no indication in the documents provided whether plaintiff was convicted or pled guilty to the violation. However, at some point, Immigration and Naturalization Service (INS) officials were notified of plaintiff's return and executed a Consent Agreement to leave the United States (the agreement has not been provided). Plaintiff was deported on July 15, 2002 to the United Kingdom, but was returned based on his status as a felon in the United States. Upon his return, plaintiff was housed in the Hudson County Jail and thereafter relocated to the Sussex County Jail. On March 24, 2003, plaintiff was transferred to the Middlesex County Adult Correctional Center ("MCACC").

Upon arrival at the MCACC, plaintiff was provided with a mattress and bedding materials and assigned to the general intake unit, as opposed to a cell, where he spent his first night. The following day, on March 25, 2003, plaintiff was awoken and instructed to pack his belongings and

2

proceed to Cell #306. Plaintiff's belongings included 3 bags of legal materials as well as his mattress and bedding supplies. Unable to carry everything, the plaintiff left the three bags of legal materials and proceeded to Cell #306. Escorted by Defendant Corrections Officer Thomas Johnston, plaintiff arrived at his assigned cell and requested permission to retrieve the remainder of his belongings. Defendant Johnston ignored the request and closed the cell door.

As Defendant Johnston walked away from Cell #306, plaintiff "protested loudly," as an alleged effort to ensure Defendant Johnston heard plaintiff's plea. In response, Defendant Johnston returned to Cell #306 and allegedly stated that, "You should never yell at me" and "I am the officer here and I can do whatever I want," while using profanity and referring to plaintiff as a "foreigner." (See Complaint, ¶ 10). Plaintiff maintains that he verbally objected to Defendant Johnston's language, specifically the use of an explicative and the reference to plaintiff as a "foreigner." It is claimed that Defendant Johnston became "very aggressive, and began to push and bump Plaintiff with his chest to appear as if there had been an altercation," using profanity and telling plaintiff that he was going to "teach [him] a lesson . . ." (See Complaint, ¶ 11).

The record indicates that Defendant Corrections Officer Jay Botnick observed Defendant Johnston and plaintiff "exchanging words" and plaintiff "waiving his hands in front of C/O Johnston. C/O Johnston was then backing inmate [] into cell 306." (See Report of Botnick, Exhibit 1-D of Plaintiff's Exhibits). Defendant Botnick called a "code" on the radio. Upon receipt of the "code," Defendant Johnston allegedly grabbed plaintiff by his shirt collar and dragged him out of Cell #306. It is claimed that approximately ten (10) corrections officers without any resistance from plaintiff, assaulted plaintiff, lifting plaintiff off the ground and "forcefully slammed Plaintiff's face head-on to the concrete floor" in order to restrain plaintiff and place him in handcuffs. (See Plaintiff's

3

Opposition, Undisputed Facts).  Plaintiff states that he was struck in the face, head and mouth several times with clenched fists causing swelling and bleeding.  Another corrections officer allegedly knelt on the plaintiff's back causing injury to plaintiff's lower back.  Plaintiff was brought to an interrogation room and thereafter sent for medical treatment.  Plaintiff was "charged" for his conduct resulting in segregated detention in solitary confinement.

Following the incident, plaintiff was treated by a nurse with Tylenol and an ice pack for his swollen face.  The next morning, at approximately 7:30 a.m. on March 26, 2003,  plaintiff requested medical treatment for "pain in his face, loosened teeth, head, neck, shoulder and lower back pains, mouth and gum bleeding." (See Plaintiff's Opposition, Undisputed Facts).  The plaintiff was seen at approximately 12:30 p.m. by Dr. Angelique Colbert.  Plaintiff was diagnosed with cervical myositis, thorasis myositis, and cephalgia.  The physical assessment further noted a "tenderness on palpation of the C-spine" with "some restriction of motion."  The reviewing doctor also indicated that the plaintiff claimed to be suffering from diarrhea that started that morning.

On April 6, 2003, the plaintiff again requested treatment claiming back, shoulder and head pain and bleeding gums.  The plaintiff maintained in his request form that he could no longer exercise and needs a lower bunk bed.  The documents suggest that plaintiff was seen by a nurse on April 8, 2003, who signed a Recreation Restriction Form prohibiting plaintiff from engaging in all physical activity until cleared by a doctor.  The plaintiff's treatment request form also contains notes that suggests that the plaintiff was seen on April 10, 2003 at 11:00 a.m.[1]  Nevertheless, on April 10, 2003, an order was entered restricting plaintiff to a lower bunk.

---

[1] The photocopy provided is cut off and it cannot be deciphered who transcribed these notes, whether by a doctor or nurse.

4

On June 22, 2003, plaintiff advised a corrections officer that he was suffering from severe abdominal pains and blood in his stool. Plaintiff was taken to the medical unit where he was examined by Dr. Rajesh Wadhwa and cleared to return to his cell. Documents indicate that plaintiff was prescribed Donnatol, advised to use "sitz bath," and increase fluids to avoid constipation. The plaintiff made similar complaints on the following day, as reported in a request for medical services form.

On September 3, 2003, plaintiff filled out a request for medical services form claiming to have a body temperature, migraine headache, pain in his right bottom and thigh, and a cough. Plaintiff was prescribed Motrin and another form of medication (illegible on the form) and told to apply a cold compress to his forehead and warm compress to his right hip until he is seen by the doctor. Dr. Colbert stamped the form on September 4, 2004 at 10:40 a.m.

Plaintiff next requested medical attention on November 15, 2003 when he complained of a nose bleed and blurred vision. On November 17, 2003, an Immigration Health Services Treatment Authorization Request form was compiled. The form indicates that plaintiff had been requesting an eye exam for three months. The following day, the United States Public Health Service approved the request.

On November 23, 2003, plaintiff complained of a cough which because of alleged lack of treatment had started to cause heartburn and allegedly prevented the plaintiff from swallowing food. Plaintiff also lodged complaints regarding bleeding gums and claimed that his eyes had gotten worse and were watery. The nurse apparently advised the plaintiff to gargle with salt water for his cough and provided instruction on oral hygiene for his bleeding gums.

Plaintiff was seen by an eye specialist on December 11, 2003. While portions of the

diagnosis are indecipherable, it is clear that plaintiff was diagnosed with an astigmatism.

On December 31, 2003, the plaintiff complained of a cold and unheated solitary confinement, migraine headaches, watery eyes, and pain preventing him from sleeping. The report was stamped by Dr. Colbert on January 1, 2004. The plaintiff was provided with 400 mg of Motrin for 14 days. The plaintiff was further advised that the facility awaited delivery of corrective lenses.

On January 15, 2004, plaintiff received his corrective lenses.

## II.

Defendant Corrections Officers Johnston, Botnick, and Russo maintain that the plaintiff's Complaint should be dismissed under the Prisoner Litigation Reform Act of 1995 (PLRA), 42 U.S.C. 1997e(a), due to the fact that plaintiff has not exhausted his administrative remedies. That section provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title...by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. 1997e(a). This rule is not limited to "prison conditions" but extends to all aspects of prison life including claims of excessive force. See *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Nyhuis v. Reno*, 204 F.3d 65, 75 (3d Cir. 2000).

Defendants suggest that plaintiff appealed a Facilities Administrative Courtline Hearing, held on April 2, 2003, of which no disposition has been rendered. As such, defendants maintain that plaintiff's failure to exhaust his administrative remedies is grounds for dismissal. Without addressing why the appeal of the Facilities Administrative Courtline Hearing has yet to be decided after nearly three and a half years, the PLRA's exhaustion requirement is inapplicable here. Under PLRA, it must be established that plaintiff is a "prisoner confined in any jail, prison, or correctional facility" when the "action [is] brought," 42 U.S.C.S. § 1997e(a). In *Greig v. Goord*, 169 F.3d 165

6

(2d Cir.1999), the Second Circuit held that "litigants...who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of §1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision." *Greig*, 169 F.3d at 167.  A plaintiff is subject to the exhaustion requirement of §1997e(a) if, and only if, he "was a confined prisoner at the time he filed his lawsuit[ ]." *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2003). The term prisoner does not include a person held for violation of an immigration regulation.  As one court stated:

> The list of reasons for confinement that §1915(h) explicitly specifies as rendering someone a "prisoner" is extensive, but does not include detention pending deportation; "the absence of immigration regulations from the laundry list of other things one might violate [such as] parole, probation, and the like," [*Ojo v. INS*, 106 F.3d 680, 682 (5th Cir. 1997)], implies that confinement for a violation of immigration regulations is not included within the §1915(h) definition. "Had Congress wished to include immigration violations in this provision, it easily could have said so." *Ojo*, 106 F.3d at 682. And since "deportation proceedings are civil, rather than criminal, in nature," [*Agyeman v. INS*, 296 F.3d 871, 886 (9th Cir. 2002)], persons detained in the course of deportation need not be considered analogous to persons detained in the course of criminal prosecution; a distinction between the two classes of detainees is entirely reasonable. Persons detained pending deportation are more analogous to persons civilly detained under a sexual-predator statute or following a verdict of not guilty by reason of insanity, who have also been held not to be "prisoners" for PLRA purposes. [] Therefore, [] "[w]hen [a plaintiff] [i]s detained... under the INA for deportation purposes, he bec [omes] an 'alien detainee,' not a 'prisoner.' " [*LaFontant v. INS*, 135 F.3d 158, 165 (D.C. Cir. 1998)](citing *Ojo*, 106 F.3d at 683).

*Gashi v. County of Westchester*, 2005 WL 195517 (S.D.N.Y. 2005).

It is clear that when a INS or BICE detainee is being held, said detainee is not considered a "prisoner" under the PLRA.  While defendants, in reply, review the plaintiff's criminal history and the outstanding warrant awaiting the plaintiff when he returned to the United States in 2002,

defendants also indicate that a Consent Agreement was entered into by the plaintiff and the INS. This agreement has not been provided and may confirm the plaintiff's classification. Without this agreement, the Court is left only with the documents that have been supplied, which suggest that he was an INS/BICE/federal detainee. Thus, the Court must treat the plaintiff as a BICE detainee, to whom PLRA is inapplicable.

III.

Section 1983 of Title 42 subjects to liability:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. 42 U.S.C. § 1983.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"*Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "The first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989), and *Baker*, 443 U.S. at 140). To establish a viable § 1983 claim, a plaintiff must demonstrate that "the conduct complained of was committed by a person acting under color of state law" and that the "conduct deprived the plaintiff of his rights, privileges and immunities secured by the Constitution or laws of the United States." *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981) overruled in part on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986)).

8

*Defendant Corrections Officers Johnston, Botnick, and Russo*

In excessive force cases involving a person in police custody and/or pretrial detention, a Court must analyze the claim using a Fourteenth Amendment substantive due process analysis. *Graham*, 490 U.S. at 392-94. Since plaintiff was a BICE detainee while confined at MCACC, the Court must examine the excessive force claim under the Fourteenth Amendment substantive due process standard.

In *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), the Supreme Court set forth the standard to be applied in analyzing whether a detainee has been deprived of liberty without due process of law. The accepted standard is whether "those conditions amount to punishment of the detainee," a standard which does not recognize de minimis punishment. *Id.* As part of this analysis, a court must also "decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* By way of example, it is accepted that retribution and deterrence do not amount to legitimate non-punitive governmental objectives. *Id.* at 539, n. 20, 561-62.

A court must examine, subjectively, "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).

"[W]hether certain correctional officials used excessive force [is] primarily a fact question for the jury." *Shabazz v. Felsnik*, 129 Fed.Appx. 726, 728 (3d Cir. 2005). On this motion for summary judgment, it cannot be said that as a matter of law, the corrections officers taking part in restraining the plaintiff, who, locked in his cell, loudly voicing his complaints regarding his separated belongings and may or may not have been kicking the cell door, used the appropriate force.

There is no doubt that Defendant Johnston and Defendant Botnick took part in the restraining efforts. The remaining officers who participated are not clearly identified. An inmate on the lower floor provided a statement that suggested that approximately 10 corrections officers proceeded up the stairs to respond to the code. This inmate, however, did not witness the event which gives rise to this Complaint or provide names or descriptions of any of the officers.[2]

It is clear that Defendants Johnston and Botnick were involved in the incident on March 25, 2003 and, therefore, summary judgment on this count is denied as to these defendants. However, plaintiff's failure to set forth any facts to suggest Defendant Russo's involvement is detrimental to his claim. Summary judgment is therefore granted to Defendant Russo on the claim of excessive force.

*Defendant Warden Abode, Defendant Deputy Warden Cicchi and Middlesex County Defendants*[3]

The plaintiff claims that he was deprived of necessary out-patient care because his detainment had not exceeded one year in duration. The plaintiff maintains that he was told BICE would not pay for out-patient treatment for detainees who have been detained for less than a year. As a result, it is alleged that Defendant Warden Abode and Defendant Deputy Warden Cicchi directed that such treatment be denied.

The Court need not determine whether the alleged policy violates a constitutional right if it

---

[2]

Although it is troubling that Defendant Russo fails to deny his involvement in the opposition or supporting papers, by way of an Affidavit, the burden is on the plaintiff to come forward with some evidence to avoid summary judgment.

[3]

The Middlesex County Defendant include the Middlesex County Corrections Commissioner, the Middlesex County Department of Corrections, the Middlesex County Adult Corrections Center, and the Middlesex County Board of Freeholders.

can be found that the plaintiff was not deprived of any rights, privileges or immunities.  If the plaintiff was not in need of out-patient medical care for his alleged injuries, the constitutionality of the policy is not before the Court.  Whether plaintiff was deprived of a right, privilege or immunity in this context or, in other words, whether the plaintiff was deprived of necessary out-patient medical treatment, is adequately addressed by inquiring whether the plaintiff had a "serious medical need" and whether the defendants showed a "deliberate indifference" to those needs.

The Third Circuit holds that prison personnel who are not physicians and have no direct contact with the inmate concerning his medical needs cannot be considered deliberately indifferent for failing to respond to an inmate's medical needs when the inmate was already receiving treatment from the prison's medical staff. *Anderson v. Bureau of Prisons*, Slip Copy, 2006 WL 929373 (3d Cir. 2006)(citing *Durmer v. O'Carroll*, 991 F.2d 64, 68-69 (3d Cir.1993)).  However, this unique situation is distinguishable in that it calls into question an alleged policy to be deliberately indifferent to certain inmates in need of out-patient care.  If the plaintiff did in fact require out-patient care and was denied such care on account of the warden's and deputy warden's direct orders, such would rise to the level of deliberate indifference giving rise to a §1983 claim.  This is irrespective of whether the plaintiff was receiving treatment from the prison's medical staff, as such treatment would be insufficient.

Plaintiff, however, fails to provide any evidence, in the form of an expert report, subsequent medical records, or anything of the like that would suggest or tend to support the claim that plaintiff required out-patient care.  It is for this reason that plaintiff's claim against Defendants Warden Adobe, Deputy Warden Cicci, and the Middlesex County defendants must fail.

*Medical Defendants*[4]

Prison systems have a duty to provide prisoners with adequate medical care, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and "[t]he Eighth Amendment proscribes deliberate indifference to prisoners' serious medical needs." *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir.2 004); *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).  To establish a violation of his or her Eighth Amendment right to adequate medical care, an inmate "must show (I) a serious medical need, and (ii) acts or omissions by prison officials that indicated deliberate indifference to that need." *Id.*; *Jackson v. Fauver*, 334 F.Supp.2d 697, 706 (D.N.J. 2004).  A serious medical need is a need diagnosed by a physician, that the physician believes to require medical treatment, or a need that is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 334 F.Supp.2d at 706 (quoting *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987)).

Finding a prison official was deliberately indifferent requires a showing that the official "knew of and disregarded an excessive risk to [the] inmate['s] health." *Natale*, 318 F.3d at 582 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  A plaintiff must "present enough evidence to support the inference that the defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001); *Heggenmiller v. Edna Mahan Corr. Inst. for Women*, 2005 WL 826070, slip copy at 1 (3d Cir. 2005).  Deliberate indifference has been found in situations where "necessary medical treatment is delayed for non-medical reasons," or where objective evidence established that a prisoner had a serious need for

---

[4]

  The Medical Defendants consist of Dr. Rajesh Wadhwa, Nurses Gwen Scruzz and Sandra Vargas, and C.F.G. Health Systems, Inc.

medical care and the official ignored that evidence. *Natale*, 318 F.3d at 582 (citations omitted). Allegations of negligence, medical malpractice and mere disagreement as to the proper medical treatment are not sufficient to establish an Eighth Amendment violation. *Jackson*, 334 F.Supp.2d at 706, 710; *Spruill*, 372 F.3d at 235; *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993).

However, as discussed above, BICE detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process clause. *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987); *Bell*, 441 U.S. 520; *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077 (3d Cir.1976). The Due Process clause requires the government to provide appropriate medical care. *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983). The Supreme Court has observed that the Due Process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* at 244. The standard to be applied mirrors the deliberate indifference standard of *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). *Boring*, 833 F.2d at 472.

The record does not suggest that plaintiff was denied medical care when it was requested. In fact, the plaintiff was seen by either a doctor or nurse upon each of his requests. Thus, plaintiff's claim does not appear to be with the attention to his medical needs, but the suitability of the treatment. However, plaintiff's disagreement as to the proper medical treatment for a prisoner is insufficient to establish a deliberate indifference to a serious medical need. *Spruill*, 372 F.3d at 236.

Plaintiff's claims against the medical defendants under §1983 for failure to provide adequate medical care is dismissed as the record reveals that the medical defendants were attentive to plaintiff's medical complaints, and plaintiff is precluded from challenging proper course of treatment under the deliberate indifference standard.

*Supervisory Liability*

A supervisory official may be liable where not directly involved in the constitutional violation when the misconduct is "affirmatively link[ed]" to the action or inaction of the supervisor. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).

Plaintiff's reference to Captain Powell, Lieutenant Wood-Teeple, and Lieutenant Gilrain is scant; but plaintiff suggests that these individuals are responsible in that they allegedly "authorized, directed, approved and ratified all acts alleged . . ." Similarly, upon information and believe [sic], each and every corrections officer . . . acted upon the instruction, authority, and control" of said defendants. (*See,* Answers to Interrogatories Propounded by Defendants Powell, Wood-Teeple, and Gilrain).

Beyond these bald assertions, plaintiff has come forth with no evidence whatsoever to suggest that the conduct of the corrections officers on March 25, 2003 was "authorized, directed, approved [or] ratified" by these defendants. In fact, Defendant Powell, in an Affidavit, has stated that neither he nor either of the named defendant lieutenants were present in plaintiff's housing unit on March 25, 2003 when the "code" was called by Defendant Corrections Officer Botnick. Nor did any of these defendants respond to the "code." The mere fact that the names of these defendants appear on reports prepared in connection with the incident alleged to have occurred on March 25, 2003, does not state a claim for supervisory liability under §1983.

Plaintiff's references in his Complaint to Defendant Sergeant Delgado are similarly limited. When describing this individual's involvement in the case, the plaintiff states that Delgado: "Sanctioned, supervised and ordered the wrongful conducts of officers as alleged in this complaint. Made statements to Plaintiff, and conducted separate interview during investigations."

14

In the factual portion of plaintiff's Complaint, plaintiff does not indicate that Defendant Delgado was involved in the alleged altercation on March 25, 2003. Following the alleged incident, plaintiff was interviewed by Delgado who "listened to Plaintiff's complaint of several pains and injuries, and promptly instructed that Plaintiff be taken to the prison clinic for medical care and treatment."

Only now on summary judgment does plaintiff claim, in his statement of undisputed facts, that Delgado played a physical role in the alleged altercation on March 25, 2003. While the Court should liberally construe plaintiff's Complaint, as a pro se plaintiff, when the allegation is not set forth in the Amended Complaint or alleged at the time of plaintiff's deposition, this cause of action cannot be recognized. Even if the Court does recognize the plaintiff's allegation that Defendant Delgado partook in the events on March 25, 2003, the plaintiff has presented no evidence that would suggest his participation beyond the mere allegation in opposition to the motion for summary judgment. Thus, plaintiff's claim against Delgado amounts to a claim for supervisory liability.

To establish supervisory liability, a plaintiff must demonstrate "actual knowledge and acquiescence." *Baker v. Monroe Township*, 50 F.3d 1186, 1194 & n. 5 (3d Cir.1995), and show that the defendant was the "moving force" behind the alleged injury.

The plaintiff has failed to sustain his burden to demonstrate that Sergeant Delgado was the "moving force" behind the plaintiff's alleged injuries. While plaintiff maintains that Delgado stated subsequent to the event, "Oh, I know, they really tossed you up...," even if true, such does not suggest actual knowledge and acquiescence, but mere subsequent knowledge of the alleged incident.

Plaintiff has presented no evidence that would support a claim to hold these defendants liable in their supervisory capacities. Therefore, summary judgment as to Defendants Powell, Wood-Teeple, Gilrain, and Delgado is granted.

15

IV.

Defendants maintain that even if the Court were to find that the actions of Defendants Johnston, Botnick, and Russo constitute excessive force, summary judgment is warranted based on the doctrine of qualified immunity.

In considering whether qualified immunity applies, a court must first decide whether the facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation. *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir.2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272). If so, the court next determines whether the constitutional right in question was clearly established. *Id.* at 277 (citing *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. *Id.* at 205.

A reasonable juror could base a finding that the corrections officers used excessive force in restraining the plaintiff. It would seem that the conduct exhibited by the corrections officers in restraining the plaintiff, considering the facts in a light most favorable to the plaintiff, gives rise to a jury question. These facts suggest that the plaintiff was loudly voicing a complaint when a code was called. The plaintiff offered no resistance to the efforts of the corrections officers who proceeded to drag the plaintiff out of his cell, lift him off the ground, dropping him face first into the ground, hitting plaintiff with closed fists, and kneeling on plaintiff's back in order to handcuff him. As a result, the plaintiff required medical attention. Given these facts, which the Court is required

16

to accept as true for the purposes of this summary judgment motion, qualified immunity should not extend to these defendants.

V.

To state a claim under §1985(3) a plaintiff must allege (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983); *Griffin v. Breckenridge*, 403 U.S. 88 (1971).

Section 1985 "covers conspiracies to deprive a person of his or her rights to equal protection or equal privileges and immunities by conspirators who have 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus...'" *Berlanti v. Bodman*, 780 F.2d 296, 299 (3d Cir. 1985)(quoting *Griffin*, 403 U.S. at 102). It is certainly clear that the plaintiff, a African immigrant and BICE detainee, belongs to an identifiable class. *Farber v. City of Paterson*, 440 F.3d 131, 137 (3d Cir. 2006).

Our courts have long held that victims of a conspiracy motivated by race discrimination may bring a §1985(3) claim. *Griffin*, 403 U.S. at 102. However, victims of mere commercial or economic animus may not. *Scott*, 463 U.S. at 838. Here, while plaintiff alleges he is a member of an identifiable class deprived of necessary out-patient care, plaintiff readily admits that the policy was economically motivated. In his Complaint, the plaintiff concedes that the reason for the denial of such treatment was because "Immigration authorities will not pay for such treatment." (See Plaintiff's Complaint, Count 3). Thus, the plaintiff's allegation that the policy instituted by the

17

MCACC, at the direction of the warden and deputy warden not to pay for such treatment, rises merely to the level of economic animus.[5]

Plaintiff has failed to present any fact that would suggest that those alleged to conspire, Defendant Abode, Defendant Cicchi, and the medical defendants, were in any way motivated by discriminatory animus. The plaintiff's sole allegation of any racial or class based hostility were the alleged comments made by Corrections Officer Johnston who is not alleged to be a conspirator. However, a single officer's use of a racial epithets can be viewed, at most, as evidence of individual discriminatory animus on the part of the officer and without any evidence for a jury to find an agreement or concert of action necessary to constitute a conspiracy, plaintiff's claim under §1985 must fail. *Armstrong v. Borie*, 494 F.Supp. 902, 906 (E.D. Pa. 1980).

The mere fact that plaintiff is a member of an identifiable class does not obviate the need of the plaintiff to demonstrate discriminatory animus. That the conspirators were motivated by a racially discriminatory animus is a necessary element of a §1985(3) claim. Plaintiff's failure to allege or provide any facts that would support such motivation is detrimental to plaintiff's claim.[6]

---

[5]

While the issue of whether a conspiracy was formed is also questionable, the Court need not reach this issue.

[6]

Based on the same set of facts giving rise to plaintiff's allegation of conspiracy, plaintiff alleges a violation of the New Jersey Law Against Discrimination (NJLAD) against the medical defendants and "policy making authority of the State." *N.J.S.A.* 10:5-1 to -42, prohibits discrimination "because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States, or nationality." *N.J.S.A.* 10:5-3. However, plaintiff has failed to demonstrate that he was in need of out-patient care and, thus, sustained no injury as a result of the allegedly discriminatory policy. Therefore, this claim is dismissed.

VI.

A §1986 plaintiff must show that: (1) the defendant had actual knowledge of a §1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a §1985 violation, (3) the defendant neglected or refused to prevent a §1985 conspiracy, and (4) a wrongful act was committed. See *Perez v. Cucci*, 725 F.Supp. 209, 254 (D.N.J.1989) (citations omitted), aff'd, 898 F.2d 142 (3d Cir.1990).

The conspiracy alleged by plaintiff is among the medical provider employees, Warden Abode, and Deputy Warden Cicchi and was designed to deprive the plaintiff of adequate medical care.  However, "[i]f the elements of the §1985 conspiracy are missing, a §1986 cause of action is properly dismissed on summary judgment." *Clark v. Clabaugh*, 20 F.3d 1290, n. 5 (3d Cir. 1994). In this case, following guidelines of BICE can not give rise to a conspiracy.   Therefore, summary judgment must be granted as to plaintiff's claims pursuant to §1986.

VII.

The Third Circuit has held that, "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right." *Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000)(quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir.1999)( en banc)). Accordingly, a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he was denied.  *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). To show retaliation, a plaintiff must establish that (1) he engaged in constitutionally protected activities, (2) that he suffered an "adverse action" at the hands of prison officials, and (3) that there is a causal link between the exercise of his constitutional right and the adverse action taken against

19

him. *Id.* at 333-34. The burden then shifts to the defendant to show by a preponderance of the evidence that the plaintiff would have received the same punishment, or alternatively stated, that defendant would have taken the same action, absent the retaliatory motive for reasons reasonably related to a legitimate penological interest. *Id.*

It is alleged that since the plaintiff filed or attempted to file his Complaint, plaintiff was subjected to retaliatory treatment at the direction of Warden Abode and Deputy Warden Cicchi. The Third Circuit has held that the filing of a lawsuit is protected activity under the First Amendment right of prisoners to petition the court. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir.1997); *Milhouse v. Carlson*, 652 F.2d 371, 373-74 (3d Cir.1981). Courts have also held that the filing of grievances is protected under the First Amendment right to petition the government for a redress of grievances. See *Allah v. Al-Hafeez*, 208 F.Supp.2d 520 (E.D.Pa.2002).

As discussed above, "[s]upervisory liability can be shown in two ways, "either through allegations of personal direction of or actual knowledge and acquiescence." *Andrews*, 895 F.2d at 1478. It is claimed that on April 15, 2003, plaintiff was sent to segregated solitary confinement due to his refusal to attend mandated recreation from which he had been medically restricted. Thereafter, on May 4, 2003, May 9, 2003, May 12, 2003, and June 22, 2003, the plaintiff alleges he was subjected to "harassment, assaults, beatings, false and unjustifiable filings of disciplinary charges" resulting in segregated lock-up for more than 90 days.[7] Between June 9, 2003 and June 22, 2003,

---

[7] The identities of corrections officers or facts pertaining to the alleged "harassment, assaults, [and] beatings" are not provided. Nor are any claims brought against the actual actors in connection with the alleged incidents on May 4, 2003, May 9, 2003, May 12, 2003, and June 22, 2003. Rather, plaintiff crafts this claim against Defendants Adobe and Cicci, who allegedly ordered and/or authorized the "harassment, assaults, [and] beatings."

20

the plaintiff maintains that he was forced to sleep on the top bunk, in spite of the medical order requiring plaintiff to sleep on a lower bunk, causing plaintiff to endure pain to his back and shoulder.

While these allegations may suffice as adverse action, in order to demonstrate the necessary causal connection, plaintiff must not only put forth evidence that links the filing of the Complaint to the adverse action, but also show that such action was at the personal direction of or known and acquiesced to by Defendants Abode and Cicchi.  This plaintiff has failed to do.

Plaintiff, however, does name Defendant LaSalla in connection with the April 15, 2003 incident.  It is claimed that on April 15, 2003, plaintiff was sent to segregated solitary confinement due to his refusal to attend mandated recreation from which he had been medically restricted.  It is asserted that this was in retaliation for filing the instant Complaint.  On April 15, 2003, it is alleged that Sergeant LaSalla handcuffed the plaintiff and placed him in segregated detention and thereafter denied plaintiff procedural due process in that plaintiff was not provided written notice of the charges, a written statement of the reasons for the disciplinary action, or an opportunity to call witness and present evidence in his defense.  *Wolff v. McDonnell*, 418 U.S. 539 (1974).

While plaintiff has failed to establish a prima facie case of retaliation against Defendants Adobe and Cicci, Defendant LaSalla has failed to address the claims as alleged against him. Therefore, plaintiff's claim of retaliation, as against Defendant LaSalla remains a viable claim.

VIII.

In addition to the federal claims, the plaintiff has asserted several state law claims including assault and battery, negligence, intentional infliction of emotional distress, and medical malpractice.[8]

---

[8]  Plaintiff has also alleged a violation of the NJLAD which is addressed at FN 6.

Plaintiff's claims of assault and battery are alleged against the defendant corrections officers who were involved in the alleged incident on March 25, 2003. A person may be liable for battery under New Jersey law, if that person "'acts intending to cause a harmful or offensive contact...or an imminent apprehension of such contact' and a 'harmful' or 'offensive' contact 'directly or indirectly results.' *Restatement (Second) of Torts* §§ 13, 18 (1965). One who acts with the same intent may be liable for assault even if no contact actually results if the victim is placed in 'imminent apprehension' of a harmful or offensive contact. *Id.* at § 21." *Abraham v. Raso*, 15 F.Supp.2d 433 (D.N.J. 1998)(citing *Giovine v. Giovine*, 284 N.J.Super. 3, 33, 663 A.2d 109, 125 (App. Div. 1995)(Skillman, J., concurring and dissenting) overruled on other grounds). An "officer can be held liable for assault and battery if he uses excessive force." *Mantz v. Chain*, 239 F.Supp.2d 486, 498 (D.N.J. 2002).

Plaintiff has also asserted claims of negligence against the Department of Corrections, Board of Freeholder, MCACC, Warden Abode, Deputy Warden Cicci, Deputy Warden Esposito, Dr. Wadhwa, and CFG Health Systems for failing to provide adequate training to officials in civil rights laws, failing to delegate the provision of medical care of inmates to private contractors, failing to protect the plaintiff from risk of harm or injury, and for neglecting their duty of care to the plaintiff.

The New Jersey Tort Claims Act ("Act" or "Tort Claims Act"), *N.J.S.A.* 59:1-1 to 59:12-3, provides immunity for public entities with liability as the exception. Even where liability is present, the Act sets forth limitations on recovery. One is the limitation on the recovery of pain and suffering damages." *Gilhooley v. County of Union*, 164 N.J. 533, 538 (2000) (internal citations omitted). Under the Act:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided,

> however, that this limitation on the recovery of damages for pain and
> suffering shall not apply in cases of permanent loss of a bodily
> function, permanent disfigurement or dismemberment where the
> medical treatment expenses are in excess of $3,600.00.

*N.J.S.A.* 59:9-2(d). "[I]n order to vault the pain and suffering threshold under the Tort Claims Act,

a plaintiff must satisfy a two-pronged standard by proving (1) an objective permanent injury, and (2)

a permanent loss of a bodily function that is substantial." *Gilhooley*, 164 N.J. 533 at 540-41; see

*Brooks v. Odom*, 150 N.J. 395 (1997).

"To be considered permanent within the meaning of the subsection, an injury must constitute

an 'objective' impairment, such as a fracture." *Brooks*, 150 N.J. at 403 (quoting *Harry A. Margolis*

*& Robert Novack, Claims Against Public Entities* 159 (1996)). Absent such an objective

abnormality, a claim for permanent injury consisting of "impairment of plaintiff's health and ability

to participate in activities" merely iterates a claim for pain and suffering. *Id.*

A loss of eyesight would certainly be within the ambit of a "permanent injury" sufficient to

vault the verbal threshold of the Tort Claims Act. However, plaintiff's claim is not that he has lost

his ability to see out of his eye, but that "he can no longer use his normal vision for the rest of his

live [sic] without the use of certain type of corrective lenses prescribed by an eye expert." (See

Plaintiff's Opposition, Pg. 65). Moreover, the plaintiff's alleged injury appears to be related to the

diagnosis of an astigmatism (a misshaping of the cornea) on December 11, 2003. The plaintiff has

presented no evidence, in either an expert or otherwise, regarding permanency or causally relating

the alleged injury to any action or inaction of any defendant.

With regard to plaintiff's allegations of medical malpractice, pursuant to *N.J.S.A.* 2A:53A-27,

in any action for damages resulting from an alleged act of malpractice or negligence by a licensed

person in his profession or occupation, a claimant:

> *shall*, within 60 days following the date of filing of the answer to the
> complaint by the defendant, provide each defendant with an affidavit
> of an appropriate licensed person that there exists a reasonable
> probability that the care, skill or knowledge exercised or exhibited in
> the treatment, practice or work that is subject of the [claim], fell
> outside acceptable professional or occupational standards or treatment
> practices.

*N.J.S.A.* 2A:53A-27 (emphasis added).

The requirements of a claimant in a professional negligence case under the statutory language are clear. The claimant must serve on the defendant an Affidavit of Merit within sixty (60) days of the filing of the Answer, unless that time period is extended for an additional period of sixty (60) days upon a showing of good cause or exceptional circumstances. *N.J.S.A.* 2A:53A-27. Importantly, the Affidavit of Merit must be provided, under any circumstances, no later than 120 days after the filing of the defendants' Answer to the malpractice Complaint. *Ferreira v. Rancocas Orthopedic Assocs.*, 178 N.J. 144, 146 (2003); see also *Miladys Familia v. University Hosp. of the Univ. of Med.*, 350 N.J.Super. 563, 569 (App.Div. 2002)(finding that the concern of the Legislature was to set an outer time limit of one hundred twenty days, beyond which no extension could be granted). Plaintiff has failed to file an Affidavit of Merit or produce any evidence whatsoever that would support a claim of deviation from the standard of care by the medical defendants.

Lastly, under New Jersey law, a claim for emotional distress is recoverable if it results "in permanent physical sequelae such as disabling tremors, paralysis or loss of eyesight." *Srebnik v. State*, 245 N.J.Super. 344, 351, 585 A.2d 950 (App.Div.1991). Due to plaintiff's failure to present any such evidence, plaintiff fails to meet the verbal threshold of the Tort Claims Act.

Therefore, plaintiff's state law claims are dismissed.

IX.

Defendants have moved to dismiss plaintiff's claims for punitive damages claiming that the municipal defendants are immune from punitive damage liability under §1983 and that the actions of the individual defendants were not outrageous or unwarranted, but exercised in good faith.

While punitive damages may be awarded against individual defendants under §1983, *Smith v. Wade*, 461 U.S. 30 (1983), local governments are immune from punitive damages. *City of Newport v. Fact Concerts*, 453 U.S. 247 (1981). Punitive damages are simply not available under §1983 against a government entity. *Feldman v. Philadelphia Housing Authority*, 43 F.3d 828 (3d Cir.1994). However, considering there are no remaining viable §1983 claims against any governmental or municipal agencies the Court need not address this issue.

The individual defendants are not entitled to the absolute immunity to punitive damages afforded by the municipality. And furthermore, the actions of the individual defendants against whom claims remain viable cannot, as a matter of law, be said to lack "reckless or callous indifference to federally protected rights of others." *Coleman v. Kaye*, 87 F.3d 1491, 1497 (3d Cir.), cert. denied, 117 S.Ct. 754, 519 U.S. 1084, 136 L.Ed.2d 691.

Therefore, the motion to dismiss plaintiff's claims for punitive damages as against the individual defendants is denied.

X.

In conclusion, summary judgment is granted as to Counts 1, 3, 4, 5, 7, 8, 9, and 10 in their entirety. Summary judgment is further granted in part and denied in part as to Counts 2 and 6. As to Count 2, summary judgment is denied to the extent that plaintiff may proceed with his excessive

force claims against Defendants Johnston and Botnick.  And as to Count 6, plaintiff may proceed with his claims of retaliatory conduct as against Defendant LaSalla.

The trial of the remaining issues is set for December 5, 2006.

September 27, 2006

PETER G. SHERIDAN, U.S.D.J.